## HASTINGS et al. v. UNITED STATES.
### No. 9211.

Circuit Court of Appeals, Sixth Circuit.

Feb. 6, 1943.

Albert G. Riley, of Memphis, Tenn. (Albert G. Riley and Harry U. Scruggs, both of Memphis, Tenn., on the brief), for appellants.

Keith L. Seegmiller, of Washington, D. C. (William McClanahan, C. P. J. Mooney, and Thomas C. Farnsworth, all of Memphis, Tenn., Francis M. Shea, Lester P. Schoene, Wilbur C. Pickett, Fendall Marbury, and Keith L. Seegmiller, all of Washington,

D. C., and Richard N. Ivins, of Chattanooga, Tenn., on·the brief), for appellee.

Before HICKS, ALLEN and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

Suit by William Robert Hastings and W. W. Jones, administrator c. t. a. of the estate of William Benton Hallum, to recover the proceeds of a government life insurance policy upon the life of Hallum.

At the close of plaintiff's evidence the court granted the government's motion for a directed verdict and entered judgment thereon; hence this appeal.

Hallum, born in 1893 of unknown parents, was a Veteran of World War I. In 1906 he went to live with appellant Hastings and his wife, Myrtle, at their home near McConnellville in Obion County, Tenn., and was there fed, nourished and sent to school and in fact was treated by them as a member of the family. After leaving school he worked on the farm with Hastings and was supported by him and given spending money. Even after he was grown and went away Hastings occasionally sent him money.

Deceased enlisted on December 13, 1917 and while in the Army he kept in touch with the Hastings. It was stipulated that on January 18, 1918, while in the service he was granted a contract of yearly renewable term insurance in the amount of $10,000 on which premiums were paid to include the month of July 1919 and in which contract he designated as beneficiary, "myself, William Benton Hallum, Co. A. 28th Engrs., Camp Meade, Md." He was honorably discharged on July 14, 1919, and given transportation to McConnellville; and returned to the Hastings home. After three or four years he was stricken with tuberculosis and spent more than two years in government hospitals. He returned home the last time in September 1928, and died the following February and was buried in the Hastings cemetery lot.

It was stipulated that on February 27, 1925, deceased made application for an adjusted service (bonus) certificate in which Hastings, described therein as his "foster parent", was designated beneficiary. This certificate was issued in the amount of $1,573 and was left with Mrs. Hastings along with other papers before he went away to the hospitals. This bonus certificate was paid in full to appellant Hastings after Hallum died.

Under written application dated March 10, 1927, while he was in the Government Hospital at Oteen, N. C., deceased applied for reinstatement and conversion of his lapsed $10,000 renewable term insurance and received the policy styled "Government Life Insurance" here sued on. The policy, No. K-606454, was issued on May 18, 1927 to the deceased, to take effect as of March 1, 1927, and was a convertible five year term policy made payable to "the Estate of the Insured, No Beneficiary Within the Permitted Class Having Been Designated." Sec. 17 of the policy allowed a beneficiary to be changed by written notice to the Veterans' Bureau; and permitted an "original designation of a beneficiary * * * by the Last Will and Testament." Insured died on February 21, 1929, without having designated or changed his beneficiary by direct notice to the Veterans' Bureau.

However, appellants claim that deceased left a holographic will in the form of two letters written by him to appellant Hastings and wife, bequeathing the benefits of the policy to Hastings.

These letters were written by deceased from the Government Hospital at Oteen, N. C., on the dates of February 9 and February 24, 1927 respectively. They were written before the policy in suit was applied for or issued and were discursive affairs, largely taken up with gossip about mutual acquaintances and with concern about his health. Interlarded in not too logical position were references to insurance. The pertinent portions of these letters are as follows:

Letter of February 9: "You and Will be sure to take care of *my insurance paper & bonus* the two years are up *I can borrow about 140 dollars on it now* but dont intend to until I realy have to that isent entho to fool with and a nother thing I wouldent want to pay interest on it wich would be six per cent if I should borrow Remember *it would be worth* $1573 fifteen hundred and 73 dollars *to you if anything should happen to me* and a nother thing I want you all to see that I (am) put away if should happen to pass away that some thing we never know when it will happen so I want to have a understanding I have never said anything about it I think it best talk things over while our minds are clear thire will be plenty to put me away and have plenty left I know I can trust you all understand I am getting along fine I

**220**

am just tell you and Will and the rest so you all will know just what to do if anything should happen if any thing should happen here they will notifly from here but I will try to live until *the insurance comes due 18 years from now* that would be a nice little sum to collect at the age of 52 years would come in handy probety. * * *" (Italics ours.)

Letter of February 24: "*I am glad you all understand now how I feel about what I want done if any thing should happen to me* I sure·apreciate the fact that you and Will have thought it over *I have thought about it several times but keep putting it of until the last letter or the letter you all receive last wk* it better to have a understaings Many a person has pass away without letting anybody know just how things were standing *and a nother thing I wish to mention that is the insurance will have to be sign* by a Doctor also a Notary Publice—well you all would know what to do any way the best thing would be best to get a lawyer or somebody who would be able to give advice—As to the place of buriel that doesnt matter Walnut Grove or any place you all think best or which one is handy if anything should here the Government would pay my expense I think they allow $150 one hundred and fifty dollars Buriel exspense and pay the rail way fare I dont know what kind a casket they furnish here I know what what they furnish at a Soildiers home—it is nice enoth for any body All I ask is a reasonal Buriel if I were to pass away while I am here which a person can never tell I would have plenty to put me away and have plenty left and have a nice buriel a person never knows what might happen I might leave here in a short while wouldent have a penny—so that why *I want you all to take care of the insurance Besides it is made out so Will can get it at my death* as I said before thire would be plenty left cause I wouldent want any more than what reasonibl for buriel—I will leave it up to all to do what you all think best if any thing should happen. * * *

"P. S. I hate to write such a sad letter—But it is the only way to have a understanding." (Italics ours.)

On July 25, 1939, following the refusal of the Veterans' Administration to construe these letters as a designation of Hastings as beneficiary, upon application of Hastings, one of the appellants here, the two letters were probated in the County Court of Obion County, Tenn., as the last will and testament of deceased, and W. W. Jones, appellant, was appointed administrator c. t. a. of Hallum's estate. The validity of this probate and the appointment of Jones as administrator is not questioned.

■ The county courts of Tennessee have no jurisdiction to construe wills but the chancery courts of that state do have such jurisdiction. See the discussion in Sizer's Edition of Pritchard on the Law of Wills and Executors, Sec. 781, p. 897. On January 17, 1941 appellant Hastings and his wife, Myrtle, filed an original bill in the Chancery Court of Obion County, Tenn., against Jones, administrator (in which the United States and the Veterans' Administration were unavailingly invited to join and be heard), seeking a declaratory judgment or decree establishing the rights of Hastings as a legatee under the will or as a designated beneficiary under the provisions and conditions of the policy. On the hearing of that cause, the court filed its opinion, to the effect that a testamentary disposition of the policy was made in the will to Hastings and that he was the beneficiary and legatee of the benefits and proceeds thereof and that such proceeds did not escheat to the state.

Thereupon, the probate proceedings, along with the declaratory judgment, were submitted to the Veterans' Administration as additional evidence that the deceased left a last will and testament and that there was no escheat of his estate under the laws of Tennessee as claimed by the Veterans' Administration, and therefore there was no escheat to the United States, as provided in 38 U.S.C.A. § 512, as amended, in effect as of June 7, 1924. The Veterans' Administration, upon consideration of this additional evidence, still denied appellants' claim, hence this suit.

■ The proceedings in the Chancery Court of Obion County were offered in evidence in the District Court and were excluded. This action is assigned as error. It was not error. Appellee had an interest, to wit, $10,000, or the amount of the policy, which would be affected by the declaratory judgment and was not a party to the chancery suit. Its rights therefore could not be prejudiced thereby. See Williams Code of Tenn., Sec. 8845.

■ The probated will was offered in evidence by appellants in support of their claim and on appellee's motion for a direct-

ed verdict it was the duty of the District Court to construe it. The court concluded that the letters "clearly had reference to this bonus insurance or bonus certificate" and that "certainly there is not any proof here that could be said that the plaintiff was entitled to this man's money, or rather was designated as a beneficiary."

We think this construction was not permissible. In construing a will, the court may not speculate as to what the testator intended to do. Its function is to ascertain what the words written by him really mean and this is to be determined by the most reasonable and natural reading of the language. This is fundamental.

When the deceased in the letter of February 9 wrote, "You and Will be sure to take care of my insurance paper & bonus" we think he meant just what he wrote, to wit (1) the insurance, and (2) the bonus certificate. It is urged that because he was uneducated he must have been using the term "insurance" indiscriminately to mean the bonus certificate. This does not naturally and necessarily follow. There is in evidence a letter written by him in 1925 and another undated letter which reveal that therein the deceased carefully used the terms "bonus" or "certificate" in referring to the bonus certificate, and his precise usage at that time lends strength to the inference that when in 1927 he used the phrase "insurance & bonus" in the letter of February 9 he was differentiating between the two concepts and meant "insurance" when he used that term.

It is true enough that certain language in the letter of February 9 is descriptive of the bonus certificate and that he refers to it at one point as the insurance. But, in the letter of February 24, the last he ever wrote upon the subject, he makes no reference whatever to his bonus certificate. He refers twice to "insurance" and when one reads, "And another thing I wish to mention, that is the insurance will have to be sign by a Doctor also a Notary Publice" little doubt is left that he meant anything other than "insurance." One may sense that in the interim between the two letters there had been a change in his mental attitude. In the first he was getting along fine and hoped to live eighteen years. In the second he was thinking of death. He said, "Many a person has pass away without letting anybody know just how things were standing." He gave instructions touching his burial and he said, "I might leave here in a short while, wouldent have a penny— so that why I want you all to take care of the insurance. Besides it is made out so Will can get it at my death. * * *" And in the postcript he said, "I hate to write such a sad letter,—But it is the only way to have a understanding."

We need not determine why he wrote that "it" (manifestly the insurance) "is made out so Will can get it at my death * * *" when the policy had not at that time been applied for. It is a fair inference that he wrote the letter of Feb. 24th as a part of a unitary arrangement whereby the old policy would be converted into the new which took effect four days later and in which Will Hastings was to be the legatee. The deceased returned to the Hastings home from the hospital at Oteen in September 1927, and left the policy for safekeeping with the Hastings. It must be kept in mind that under the law of Tennessee, regardless of when the will was written, it spoke and took effect as if it had been written immediately before the death of the testator. At that time the policy was in effect and the law presumes that he did not die intestate as to it. The courts will so construe the will as to embrace the policy if the words used by any fair interpretation or allowable implication will embrace it. Such has been the law in Tennessee since Gourley, Executor v. Thompson, 2 Sneed, 387, decided in 1854. See also McDonald v. Ledford, 140 Tenn. 471, 205 S.W. 312.

The deceased had "no connection whatever." This is the phrase Mrs. Hastings used for no relatives whatever. He was intelligent and having kept it in force he certainly did not intend that the policy escheat to the United States. We think that appellant Hastings was sole legatee under the will and entitled to the proceeds of the policy. It was error therefore to direct a verdict for appellee.

The judgment is reversed and the case remanded to the District Court for a new trial consistent with this opinion.